Argued and submitted November 6, 2015, affirmed November 16, 2016

Hector Manuel OSUNA-BONILLA,
*Petitioner,*

*v.*

TEACHER STANDARDS
AND PRACTICES COMMISSION,
*Respondent.*

Teacher Standards and Practices Commission
1303129; A156542

386 P3d 229

Ralph E. Wiser argued the cause and filed the briefs for petitioner.

Jona J. Maukonen, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and DeVore, Judge, and Flynn, Judge.

**DEVORE, J.**

Petitioner, a former teacher, seeks judicial review of an order of the Teacher Standards and Practices Commission (TSPC), revoking for one year his privilege to reapply for a teaching license.[1] In his first three assignments of error, petitioner contends that the commission's order is not supported by substantial evidence primarily because the commission relied on hearsay. That hearsay was prior testimony from several students, given under oath and subject to cross-examination in a criminal trial. We conclude that, under the circumstances, the testimony satisfied the standard of reliability for evidence in an administrative proceeding and that substantial evidence supported the commission's order. We reject, without discussion, the fourth assignment of error, challenging the choice of sanction. Consequently, we affirm.

We review for substantial evidence in the record, ORS 183.482(8)(c), but "we do 'not substitute [our] judgment for that of the agency as to any issue of fact or agency discretion.'" *Day v. Elections Division,* 246 Or App 140, 145, 265 P3d 16 (2011) (quoting ORS 183.482(7)). We state the facts in a manner consistent with the agency's unchallenged factual findings and the uncontroverted evidence in the record.[2]

Petitioner is a native of Mexico who had taught high school students there for about five years. He testified that he often touched students in encouragement or in ways that were the social norm in Latino culture.

Petitioner moved to the United States in 1990. In school year 2006-07, he worked as an educational assistant at Lane Middle School for the Portland Public Schools. During that time, a female student complained to the administration after he touched her arm. The classroom supervisor cautioned him not to touch a student like he had done.

In 2008, petitioner received an Oregon teaching license. The North Clackamas School District (district)

---

[1] During this controversy, petitioner allowed his teaching license to lapse.

[2] To the extent that petitioner argues that certain evidence should have been disregarded, we address those issues in our analysis of his assignments of error.

hired him to tutor, to help students in its English as a second language (ESL) program, and to teach bilingual math and science. The school year began with a week of in-service orientation that teachers were required to attend. The orientation included a session on sexual harassment, and teachers received a copy of the district policy on sexual harassment, and the TSPC pamphlet, "The Ethical Educator & Professional Practices." The district's risk manager advised teachers, "Do not hug students. Do not touch students." The following school year began with a similar orientation and a session on sexual harassment.

During the 2008-09 school year, S was 16 years old and a teacher's assistant in petitioner's ESL algebra class at Milwaukee High School. Several times, he put his hand on her thigh as he knelt to give her instructions or as he stood up. She was uncomfortable about the contact. In fall of 2009, in the next school year, petitioner put his hand on her thigh and knee in the same way on several occasions. During that fall, on two to four occasions, petitioner massaged S's neck and shoulders with his hands, when she was seated. She would later report that, when he moved his hands down the front of her chest toward the top of her breasts, she said she did not want a massage and turned away.

In October 2009, M, then about 15 years old, began attending petitioner's tutoring class. She was uncomfortable when petitioner placed his hand on her thigh and knee when he knelt down to help her with school work. In November, she told Aguilar, a school counselor, that she was uncomfortable in petitioner's class, but she did not mention petitioner touching her thigh. Near Thanksgiving, M mentioned to petitioner that she had a sore neck, but she did not ask for a massage. She later reported that, when standing behind her, he began massaging her neck and shoulders and moved his hands down to the top area between her breasts. She pulled away, he stopped, and she left.

Just after Thanksgiving, S and M went to Aguilar. M told the counselor about petitioner touching her thigh and knee. Aguilar heard her voice quivering and saw tears in her eyes. On December 3, vice principal Busch spoke to M, heard the same account, and planned to start an investigation.

In the meantime, K, then about 16 years old, was in the ESL program and attended petitioner's math class about two days a week. On December 4, she moved her neck because it hurt. Although she did not ask, petitioner offered a massage. She later reported that he massaged her neck and shoulders, then moved his hands down to the top of her breasts and stopped. Petitioner asked for a hug, and she obliged. She said that, as she left the room, he smacked her buttocks with his hand. Disturbed, she went to a restroom and found her friend E. Together, they went to Hurd, the dean of students. Hurd saw that K was visibly upset. K recounted that petitioner had given her a massage of her neck and shoulders and touched the top of her breasts. Hurd took K to vice principal Busch, to whom K, then crying, gave the same account. Upon hearing K say the word "breast," Busch called the police immediately.

One of the responding officers, Detective Garrett, had been a resource officer in the school and had worked with petitioner on gang problems. Petitioner agreed to accompany the officers to the police station for an interview. He was not handcuffed or placed under arrest. At 2:29 p.m., the interview began and continued until 11:05 p.m. The officers told petitioner that the conversation was to be video-taped and that he was not under arrest. They advised him of his *Miranda* rights. Petitioner did much of the talking, at times joking or bantering with the officers. The officers provided petitioner with water, offered food, took rest breaks, and allowed him to call his family several times.

Throughout most of the interview, petitioner denied making any inappropriate contact with the students. Later in the interview, petitioner demonstrated on an officer how he stood behind K and M, how he massaged their neck and shoulders, and how he moved his hands down the front of their chest to touch at least the top of their breasts. He said he massaged his students because he was "attracted" to them. He admitted that he touched both of M's breasts on the outside of her clothing and that he did so "for the attraction of it." He admitted that he felt K's breasts. He said it was a "mistake," and he "was stupid." He said that he may have "swatted [K's] butt." He said that he "needed help." He

wanted "change," and he needed "therapy." Soon after, when speaking to his son, petitioner recanted his admissions and described the accusations as false.

Because the police had begun a criminal investigation, the school district did not pursue an independent investigation of its own. In March 2010, the district notified petitioner that his employment would soon be terminated and that his teaching contract would not be renewed. Petitioner filed a grievance under his collective bargaining agreement.

In November 2010, petitioner was tried on criminal charges of third degree sexual abuse and attempted third degree sexual abuse. ORS 163.415 (third degree sexual abuse); ORS 161.405(1) (attempt).[3] The complaining witnesses, S, M, and K, all testified and were cross-examined by petitioner's defense attorney. In the defense case, petitioner's predecessor Battson, testified that S was not a truthful person. The defense also offered testimony of other students who testified that S was not truthful, that the complaining witnesses were friends, and that S had said she could get rid of petitioner.[4] The court instructed the jury that the state must prove beyond a reasonable doubt, among other things, that petitioner had touched a sexual or other intimate part of a person for the purpose of arousing or gratifying sexual desire. The jury found petitioner not guilty of all charges.

After the criminal trial, petitioner's labor grievance proceeded to an arbitration hearing held in May, June, and

---

[3] ORS 163.415(1) provides:

"A person commits the crime of sexual abuse in the third degree if:

"(a) The person subjects another person to sexual contact and:

"(A) The victim does not consent to the sexual contact; or

"(B) The victim is incapable of consent by reason of being under 18 years of age; or

"(b) For the purpose of arousing or gratifying the sexual desire of the person or another person, the person intentionally propels any dangerous substance at a victim without the consent of the victim."

ORS 161.405(1) provides:

"A person is guilty of an attempt to commit a crime when the person intentionally engages in conduct which constitutes a substantial step toward commission of the crime."

[4] In the subsequent labor arbitration, Battson blamed S for the district's decision not to renew his contract.

September 2011.[5] The arbitrator required the district to prove its case by clear and convincing evidence. Petitioner admitted massaging shoulders and touching thighs, but he denied touching the students' breasts or K's buttocks. In February 2012, the arbitrator found that there was not clear and convincing evidence to believe that the more offensive contact occurred, or to believe petitioner's confession to the police. The arbitrator concluded that the district had not proven just cause to terminate petitioner. Alternatively, the arbitrator concluded that, if petitioner had done all of which he was accused, the district still lacked just cause because it failed to conduct its own investigation, and because the district failed to use progressive discipline.

In September 2012, the TSPC issued a notice accusing petitioner of gross neglect of duty in violation of ORS 342.175(1)(b) and violations of related administrative rules, noted below, all involving the accusations of the complaining students. In September 2013, an administrative law judge (ALJ) conducted a contested-case hearing on behalf of the TSPC. Although both petitioner and TSPC listed the complaining students as witnesses, neither party called the students to testify at the hearing. Instead, both petitioner and the TSPC offered, as an exhibit, excerpts of the transcripts of the testimony of those students and others who testified in the criminal trial. Petitioner did not object to the admissibility of testimony of S, M, and K. Rather, petitioner offered their prior trial testimony and the prior testimony of other trial witnesses in order to attempt to discredit the complaining students.

As in the criminal trial, petitioner testified that he innocently massaged the shoulders of two students and that he touched their thighs to steady himself when kneeling or standing. He characterized the other accusations as the product of a vendetta of S and her friends M and K. He portrayed their motives as resentment because he was a strict

---

[5] The issues included whether the district disciplined by termination without just cause, whether the district violated the labor contract by failing to employ progressive discipline before discharge, and whether nonrenewal of petitioner's teaching contract under the circumstances complied with the collective bargaining agreement.

teacher or as the students' desire for favorable immigration treatment, given to victims of sexual abuse.

The ALJ issued a 36-page proposed order, reviewing the evidence and sustaining some, but not all, of the charges of professional misconduct. The ALJ admitted without objection the criminal trial transcript offered by both parties, as well as the video recordings of the police interview of petitioner.[6] The ALJ noted that his determination of the charges would be made based upon a preponderance of the evidence, rather than the higher standards of proof in the criminal or labor proceedings.

In findings of fact, the ALJ stated, "I conclude that [petitioner's] admissions to the police that he touched the breasts of [K] and [M] was truthful and believable. His confession corroborated their detailed testimony that he touched their breasts." The ALJ observed that the interview was lengthy, but police did not physically threaten, were not verbally abusive, and did not act in an intimidating way. The ALJ noted that petitioner "voluntarily demonstrated on a police officer how he massaged the female students' neck and shoulder area, and how he ended up touching at least the top part of the students' breasts with his hands." To the ALJ, the demonstration and the admission of "attraction," "negate[d] any claim that he finally 'threw in the towel' to 'police coercion' * * * in order to end the questioning."

Accordingly, the ALJ accepted the accounts of petitioner's touching of S, M, and K as detailed in their criminal trial testimony and in their statements to school officials. They all testified that the contact made them feel uncomfortable, and they had reported the touching to school authorities and police. The ALJ found that "more likely than not, [petitioner] intentionally touched the breasts of female students." "Whether [petitioner] touched the full front of the breasts, touched the top of the breasts, or touched between the breasts," the ALJ reasoned, "is not important to determine whether his conduct constituted gross neglect of duty * * *."

---

[6] The ALJ sustained petitioner's objection to that portion of the video that contained a voice stress test, to which petitioner objected as hearsay and without scientific validity and reliability.

The ALJ concluded, first, that petitioner committed gross neglect of duty that was a substantial deviation from professional standards of judgment in violation of OAR 584-020-0040(4)(n) and OAR 584-020-0010(5).[7] The ALJ concluded next that petitioner committed gross neglect of duty by failing to honor appropriate adult boundaries with students in conduct and conversations in violation of OAR 584-020-0040(4)(o) and OAR 584-020-0035(1)(c)(D).[8] The ALJ concluded, finally, that petitioner committed gross neglect of duty by engaging in sexual conduct with a student in violation of OAR 584-020-0040(4)(f).[9] Because petitioner's license had lapsed, the ALJ recommended that TSPC revoke his privilege to reapply for a license or registration.

Petitioner took exception to the ALJ's findings and conclusions. The TSPC did not find the exceptions persuasive. The TSPC adopted the ALJ's findings and conclusions as written, and the commission imposed a sanction specifying that petitioner's privilege to apply for a license was revoked for one year.

On review before this court, petitioner assigns error in terms of a failure of substantial evidence, primarily based on the commission's reliance on hearsay to resolve the critical part of the dispute.[10] He argues that the ALJ was unable

---

[7] Petitioner does not dispute the applicability of the provisions if the alleged conduct occurred. Under OAR 584-020-0040(4)(n), "[g]ross neglect of duty is any serious and material inattention to or breach of professional responsibilities," including "[s]ubstantial deviation from professional standards of competency set forth in OAR 584-020-0010 through 584-020-0030." And, under OAR 584-020-0010(5) a "competent educator" demonstrates a commitment to the "[u]se of professional judgment."

[8] Under OAR 584-020-0040(4)(o), "[g]ross neglect of duty is any serious and material inattention to or breach of professional responsibilities," including "[s]ubstantial deviation from professional standards of ethics set forth in OAR 584-020-0035." Under OAR 584-020-0035(1)(c)(D), an ethical educator will "maintain an appropriate professional student-teacher relationship by: * * * (D) [h]onoring appropriate adult boundaries with students in conduct and conversations at all times."

[9] Under OAR 584-020-0040(4)(f), gross neglect of duty includes "[a]ny sexual conduct with a student."

[10] Petitioner argued below that TSPC failed to meet its burden because the reports and testimony of the students were not "reliable" or "probative" evidence. In the exceptions to the ALJ's proposed order, he argued that the order was not supported by substantial evidence because the TSPC had chosen to rely on that hearsay rather than to subpoena the students to testify before the ALJ.

to observe the demeanor of the complaining witnesses, that his confession was coerced, and that, after such evidence is disregarded, no substantial evidence remains upon which a reasonable person could reach the commission's conclusion.

We begin by rejecting petitioner's suggestion that we summarily disregard the evidence unfavorable to him. Although petitioner contends that his admissions to the police were coerced, the ALJ found otherwise based on substantial evidence. *See* ORS 183.482(8)(c) ("Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding."). The ALJ had the video recording of the lengthy interview. Based on that evidence, the ALJ found that the officers did not physically threaten petitioner, were not verbally abusive, were not intimidating, and did not threaten him if he did not confess. The ALJ found that petitioner's demonstration of a massage and his admissions of "attraction" negated any argument about police coercion.

Petitioner's own admissions, offered against him, were not hearsay. OEC 801(4)(b)(A). Those admissions are evidence, among other evidence, on which the ALJ could choose to rely. Although petitioner prefers the labor arbitrator's conclusion about a false confession or the jury's verdict of not guilty, petitioner offers no legal authority that requires the ALJ to reach the same conclusion, nor are we aware of any, particularly as among different decision-makers freighted with additional issues and employing different standards of proof. Exercising his own judgment, the ALJ made a permissible finding of fact about petitioner's admissions when he found the admissions were "truthful and believable." Generally, we cannot substitute our judgment for an agency on a factual dispute. *Day*, 246 Or App at 145. Accordingly, we cannot accept the suggestion to disregard petitioner's admissions.

Similarly, we cannot disregard the testimony of the complaining students simply on the basis that they did not testify in the administrative hearing and did not provide the ALJ the opportunity to assess their demeanor. Credibility may be assessed in a variety of other ways, as well. We have recognized that "credibility depends not only on demeanor

but also on such factors as inherent probability, or improbability of the testimony, the possible internal inconsistencies, the fact that it is or is not corroborated, that it is contradicted by other testimony or evidence and finally that human experience demonstrates it is logically incredible." *Preferred Funding, Inc. v. Jackson*, 185 Or App 693, 699, 61 P3d 939 (2003) (internal quotation marks omitted). A large part of petitioner's challenge to the credibility of the complaining witnesses was based on alleged differences in their accounts at different times, testimony from one student and arguably a second student about the motives of S, and petitioner's own contrary testimony. Much of that sort of credibility assessment did not depend upon the ALJ's observation of demeanor of the complaining witnesses. As a result, the lack of opportunity to observe demeanor does not require us to summarily disregard that testimony.

Nor does characterizing that testimony as hearsay require its immediate disregard. Although petitioner is correct that the students' prior testimony is hearsay within the meaning of OEC 801(3),[11] the evidence that an administrative body may consider in a contested case does not turn on the strictures of the Oregon Evidence Code as in a judicial proceeding. Instead, the Administrative Procedures Act provides:

> "Irrelevant, immaterial or unduly repetitious evidence shall be excluded but erroneous rulings on evidence shall not preclude agency action on the record unless shown to have substantially prejudiced the rights of a party. *All other evidence of a type commonly relied upon by reasonably prudent persons in conduct of their serious affairs shall be admissible.* Agencies and hearing officers shall give effect to the rules of privilege recognized by law. Objections to evidentiary offers may be made and shall be noted in the record. Any part of the evidence may be received in written form."

ORS 183.450(1) (emphasis added).

---

[11] OEC 801(3) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The students' statements in the transcript, which were made outside the administrative hearing and were offered for the truth of the matter asserted, fit within that definition of hearsay.

In *Reguero v. Teacher Standards and Practices,* 312 Or 402, 417, 822 P2d 1171 (1991), the Supreme Court observed, "The Oregon statutes governing evidence in administrative hearings reject the assumption that hearsay evidence is categorically so unreliable that it cannot be substantial. Hearsay evidence is as admissible under ORS 183.450(1) as any other evidence as long as it meets the statutory test of reliability." In that TSPC case, a former teacher urged that there should be at least a residuum of nonhearsay evidence to support a decision. *Id.* at 414. The Supreme Court, however, rejected the residuum rule and affirmed the holding of this court "that hearsay evidence alone, even if inadmissible in a civil or criminal trial, is not incapable of being 'substantial evidence' under ORS 183.482(8)(c)." *Id.* at 417.

Thus, our task is to determine whether the students' testimony is the type of hearsay evidence that is sufficiently reliable to contribute to a conclusion that substantial evidence supported the TSPC order. In *Reguero,* the Supreme Court indicated that, given the variety of cases, "variable circumstances" may be considered in assessing the "substantiality" of evidence when hearsay is involved. 312 Or at 418. The court borrowed from a treatise on administrative law to suggest a list of factors, which were illustrative, not exclusive. The court stated:

> "The 'substantial evidence' inquiry necessarily is case specific. Davis suggests, and we agree, that in assessing the substantiality of the evidence or lack of it, variable circumstances may be considered, *such as*: the alternative to relying on the hearsay evidence; the importance of the facts sought to be proved by the hearsay statements to the outcome of the proceeding and considerations of economy; the state of the supporting or opposing evidence, if any; the degree of lack of efficacy of cross-examination with respect to the particular hearsay statements; and the consequences of the decision either way."

312 Or at 418 (citing 3 Davis, *Administrative Law Treatise* 243 (2d 1980)) (emphasis added).

In *Reguero,* the TSPC denied a former teacher's application to reinstate his teaching license based on hearsay and double-hearsay statements that, while previously

teaching, he had sexual contact with two sixth-grade, female students. 312 Or at 405. There was no direct testimony by the students, no transcribed testimony, no sworn testimony, and no testimony subjected to cross-examination. *Id.* at 412. Instead, a deputy district attorney (DDA), a school counselor, and police officer retold what they had heard from two students. *Id.* at 426. The only incidental mention of sworn testimony was the DDA's recollection that when one of the students was before a grand jury, she did not remember a particular contact. *Id.* at 413. TSPC, not the former teacher, introduced the second-hand statements of the students. *Id.* at 405.

The Supreme Court noted first that live testimony would have provided an alternative to the unsworn, hearsay statements. *Id.* at 419. No one explained the students' absence, and the court assumed they were readily available. *Id.* at 414 n 16, 419. The court next noted that the TSPC decision was "based *entirely* on hearsay, particularly the hearsay testimony" of the DDA, counselor, and officer. *Id.* at 419 (emphasis in original). The court next noted a list of TSPC findings contrary to the hearsay accounts, including that the accused teacher testified and denied any misconduct, that the students were friends, and one student's statement that she was "going to get" the accused teacher. *Id.* at 420-21. Finally, the court noted that the consequence of reliance on the hearsay was not minor because the order, denying the application, denied the ability of an individual to pursue a chosen profession. *Id.* at 421. With emphasis on the absence of sworn testimony subject to cross-examination, the court concluded that, taken as a whole, there was not substantial evidence to support the TSPC conclusions. *Id.* at 421-22.

When compared with *Reguero*, this case has similarities and critical distinctions. Like *Reguero*, the alternative to hearsay would have been live testimony from the complaining witnesses. TSPC counsel did not explain why those students from the Portland area were not called as witnesses to the Salem hearing. In their absence, petitioner was entitled to put TSPC to its burden of proof. *Reguero*, 312 Or at 418 n 22. On the other hand, petitioner did not object to the admission of that testimony and offered it himself. As a consequence, the agency was not alerted to

the need to provide live testimony during one of the several days of extended hearings. Moreover, petitioner *could* have subpoenaed the complaining witnesses, particularly if their demeanor would reveal them to be unreliable. *See Day*, 246 Or App at 146 (petitioners did not object to hearsay and could have subpoenaed the witnesses); *see also Petteys v. DMV*, 195 Or App 644, 651, 98 P3d 1138 (2004) (petitioner could have subpoenaed witness, but failed to do so). As a result, the alternative to hearsay evidence does not significantly weigh in favor of petitioner. *Day*, 246 Or App at 146 (first factor weighs in favor of neither party); *Petteys*, 195 Or App at 651 (declining to give significant weight to first factor).

Like *Reguero*, "the facts sought to be proved by the hearsay" were central to the proceeding. *Reguero*, 312 Or at 418. Because this was a trial-type hearing over a number of days, rather than an expedited or routine administrative matter, considerations of economy or convenience did not provide an offsetting consideration.[12]

Like *Reguero*, the gravity or consequence of the decision is much the same consideration. In that case, the consequence of reliance on the hearsay was denial of an application for a license, and the court treated that denial as having "a profound impact on * * * the ability of an individual to pursue a chosen profession." 312 Or at 421. In that case, like this case, the sanction was the equivalent of a year's suspension before reapplying for a license.[13] As a result, the "consequences" consideration favors petitioner.

Unlike *Reguero*, the state of supporting or opposing evidence leads to a much different assessment here. We do, of course, recognize similarly opposing evidence. Like *Reguero*, in this case, there was another student, Y, who testified S had said that S wanted "to get rid" of petitioner.[14] And, like

---

[12] We will revisit relative "importance" of the testimony when we consider the corroborative effect of other available evidence.

[13] In that case, TSPC determined that Reguero was "'not entitled to reapply for certification until one year after the date of the order.'" 312 Or at 408 n 7 (quoting order).

[14] Also, student A testified that she heard S say S had gotten rid of one teacher and could get rid of another one. A was not sure what S meant.

*Reguero*, petitioner admitted innocent contacts and, at the hearing, resolutely denied sexual contacts. But, in this case, there was corroboration of the several accusing students in petitioner's admissions to the police, unlike *Reguero* where the hearsay evidence was the only evidence. As a result, the related-evidence consideration supports reliability.

This case is much different than *Reguero* when we consider an added factor present in the circumstances here: The students' statements are found in sworn testimony from a prior criminal case in which the students were cross-examined. That added factor is critical when assessing reliability, especially when we appreciate the reasons for the hearsay rule in the first place. As the Supreme Court has explained, "[b]ecause hearsay statements, by definition, have been made out of court, they lack 'conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury.'" *State v. Cazares-Mendez/Reyes-Sanchez*, 350 Or 491, 505, 256 P3d 104 (2011) (quoting *Chambers v. Mississippi*, 410 US 284, 298, 93 S Ct 1038, 35 L Ed 2d 297 (1973); *see also State v. Kendrick*, 239 Or 512, 515, 398 P2d 471 (1965) ("The ground for the exclusion of hearsay is that the opposing party has no opportunity to confront in court the person making the statement and test his veracity and accuracy by cross examination." (Citation omitted.)). In this case, apart from the ability of the decision maker to assess the demeanor of a live witness, the students' testimony presents neither of the reliability problems—lack of an oath or opportunity for cross-examination—that typically are present with hearsay.

In fact, for those reasons, the students' testimony in this case would have satisfied one of the hearsay exceptions of the Oregon Evidence Code, OEC 804(3)(a), if TSPC had demonstrated that the students were unavailable to testify. That exception provides that, where the declarant is unavailable, the hearsay rule does not exclude

"(a) Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken

in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."

OEC 804(3)(a). Rule 804 "expresses preferences: testimony given on the stand is preferred over hearsay, and hearsay, *if of the specified quality*, is preferred over complete loss of the evidence of the declarant." OEC 804 Commentary (1981) (emphasis added). The rule is premised on the view that, although not as reliable as live testimony, this type of hearsay is of sufficient "quality" to substitute when the declarant is not available.

Although we appreciate the importance of assessing the demeanor-credibility of live witnesses, generally, we are persuaded that the students' testimony, given under oath and subject to cross-examination, is nonetheless sufficiently trustworthy to be considered by the ALJ. *See* 282 Or App at 271-72 (the significance of the alternative to hearsay does not weigh heavily in favor of the petitioner). The significance of sworn testimony is explained in the legislative commentary to the Evidence Code addressing the rule that requires that witnesses must first declare by oath or affirmation that they will testify truthfully:

> "As a means of discovering the truth, [OEC 603(1)] requires that every witness make an oath or affirmation before testifying. This is important in two respects. First, the making of a promise in a ceremonial setting may induce in the witness a feeling of special obligation to speak the truth. Second, the reference to divine and positive legal sanctions may impress upon the witness the possibility of punishment for perjury, to which the oath or affirmation is a prerequisite."

OEC 603.02 Commentary (1981); *see also State v. Staley*, 165 Or App 395, 406-07, 995 P2d 1217 (2000) (discussing differing use of sworn and unsworn statements). The fact that, in this case, the critical testimony was sworn adds reliability to the testimony, because we must understand the oath to have more than ritualistic meaning. We have recognized that sworn statements bear the "earmarks of reliability" inasmuch as the affiants or witnesses subject themselves to the risk

of penalties for perjury or false swearing. *See, e.g., State v. Johnson*, 221 Or App 394, 405, 190 P3d 455, *rev den*, 345 Or 418 (2008) (allowing use of probation officer's affidavit in probation violation hearing); *see also* ORS 162.065 (perjury in sworn statement as Class C felony); ORS 162.075 (false swearing in sworn statement as a Class A misdemeanor).

Not only was the students' testimony sworn, it was transcribed. The transcript of their testimony avoided the common problems of hearsay implicit in memory or misinterpretation when one person retells what another person said. TSPC had for its consideration a professionally transcribed, word-for-word record of the testimony of S, M, and K in the criminal trial. Thus, the nature of the testimony, in the form of an accurate record, bolsters reliability.

Finally, and perhaps most importantly, petitioner already had an opportunity to test the students' testimony through cross-examination—a critical difference from *Reguero*. In the criminal case, all three complaining students were cross-examined by petitioner's defense attorney. The motivation to cross-examine was the same, if not greater, considering the criminal penalties petitioner faced at trial. In that trial, petitioner asserted the same defense, denying the accusations and arguing that the students were friends who conspired to accuse him falsely. On review, petitioner offers no plausible reason to have cross-examined differently in the criminal case than he would have done in the TSPC proceeding. As a result, the nature of the testimony, tested by cross-examination, strongly favors reliability.

For those reasons, we conclude that the testimony of the student witnesses, although hearsay, met the "statutory test of reliability" under ORS 183.450(1). *See Day*, 246 Or App at 150-51 (finding to be reliable challenged hearsay that was central to a violation of standards for obtaining signatures for an initiative). Viewing the record as a whole, we hold that substantial evidence permitted TSPC to make its findings of fact and reach its conclusions of law, revoking for one year petitioner's privilege to reapply for a teaching license. ORS 183.482(8)(c). Therefore, we affirm.

Affirmed.